**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CONNIE PAYTON, et al.,           )
                                 )
            Plaintiffs,          )
                                 )
      v.                         )     No. 06 C 465
                                 )
DONALD F. FLYNN, et al.,         )
                                 )
            Defendants.          )

**MEMORANDUM OPINION**

Before the court are defendants' motions to dismiss the third amended complaint. For the reasons explained below, the motions are granted.

**BACKGROUND**

Plaintiffs,[1] a group of investors in Emerald Casino, Inc. ("Emerald"), bring this action against directors and officers of Emerald and other persons alleged to have conspired with those directors and officers to participate in a fraudulent scheme in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The complaint alleges the following facts, which are

---

[1] Plaintiffs are Connie Payton, Myoung Hwa Bae, Ronald Blackstone, Sandra Degnan, Maureen S. Flaherty, Albert W. Johnson, Althea Knowles, Elizabeth Lucas, Joan S. Morrissey, Maureen J. Obermeier, Ernest J. Ojeda, Rudolph Rodriguez, Kathryn V. Shannon, Arthur J. Smith, Sr., Chaz Ebert, Shaun I. Gayle, Lester McKeever, Jr., Walter Grady, Jacoby Lee Dickens, Jr., and Susan Peloza. Plaintiffs are considered to be "minority person" and "female" investors pursuant to the Illinois Riverboat Gambling Act, 230 ILCS 10/11.2, and the Illinois Business Enterprise for Minorities, Females, and Persons with Disabilities Act, 30 ILCS 575/2.

taken as true for purposes of the instant motions.

### *Early IGB Proceedings and the Issuance of Emerald's Casino License*

Emerald, which is not a party to this action, is a closely-held, non-publicly-traded Illinois corporation which, since 2002, has been in Chapter 11 reorganization proceedings in this district. It was formed for the purpose of operating a riverboat casino in Illinois. At the times relevant to the complaint, defendant Donald F. Flynn was Emerald's majority shareholder and a director and officer. His son, Kevin F. Flynn, was Emerald's chairman and chief executive officer. Defendants Peer Pedersen, John P. McMahon, Joseph P. McQuaid, Kevin D. Larson, and Walter P. Hanley served in various director and/or officer roles. We will refer to the Flynns and the above-listed defendants collectively as the "director-officer defendants" where appropriate.

The Emerald story is a saga that began in the early 1990s. In 1990, the Illinois General Assembly enacted the Riverboat Gambling Act, which governs the licensing and operation of riverboat casinos in Illinois. The issuance of licenses for up to ten riverboat casinos was authorized. To administer and enforce the Riverboat Gambling Act, the General Assembly created the Illinois Gaming Board (the "IGB"). In July 1992, the IGB issued one of the ten licenses to a joint venture in which Emerald's previous incarnation

owned a 50 percent stake.[2]  The license was for gaming operations in Jo Daviess County, Illinois, and was valid for a period of three years, subject to renewal on an annual basis thereafter.  Renewals were approved in 1995 and 1996.

Business operations in Jo Daviess County faltered and in 1995, Emerald began efforts to relocate its operations to a more favorable site in Rosemont, Illinois.  In April 1997, Emerald applied for a third renewal of its license, but in June 1997, the IGB denied the application, and Emerald ceased gaming operations the following month.  Emerald sought administrative review of the IGB's ruling, and in May 1999, the administrative law judge assigned to the matter recommended that the IGB take final action to revoke Emerald's license.

### *Amendment of the Riverboat Gambling Act*

In the meantime, however, Emerald, with the assistance of Rosemont's mayor, Donald E. Stephens, had succeeded in lobbying the Illinois General Assembly to introduce a bill that would amend the Riverboat Gambling Act to allow a "licensee that was not conducting riverboat gambling on January 1, 1998," a description that only Emerald fit, to "apply to the [IGB] for renewal and approval of relocation to a new . . . location." (Complaint ¶ 52 (citing 230 ILCS 10/11.2 (a)).)  The bill also provided that the IGB "shall grant the application and approval" to relocate to a willing

_____

[2]  Emerald later became the sole owner of the license.

municipality or county to which Emerald wished to relocate. In May 1999, the Illinois legislature passed the bill, and the amendment became effective on June 25, 1999. After the measure was enacted, the IGB voted to moot all pending proceedings seeking the denial of Emerald's license-renewal application.

### *Emerald Investors*

During the years of 1998 and 1999, individuals who were interested in Emerald and its profit-making possibilities were jockeying for position as potential investors. In late 1998, even before the legislation authorizing Emerald's relocation was introduced, "billionaire oil tycoon and entertainment mogul Marvin Davis" approached Emerald seeking to invest. (Complaint ¶ 53.) The Davis Companies reached an agreement with defendant Kevin Flynn to pay $12.5 million for a 37.5 percent interest in Emerald's operations. At the insistence of Kevin Flynn and the other director-officer defendants, the agreement specified that it was to be kept confidential. This was a violation of IGB regulations, which require disclosure of transfers of ownership interests as well as agreements with or involving "Key Persons" or relatives of Key Persons. The IGB did not become aware of the agreement with the Davis Companies until nearly a year after it was entered into, and then only because the Davis Companies filed suit to enforce the agreement. The complaint alleges that in December 1998, a similar "secret deal" was reached with representatives of Richard

Duchossois, a local racetrack owner, whereby the Duchossois
interests were promised an opportunity to purchase 20 percent of
Emerald's shares. At the same time these agreements were being
reached, the director-officer defendants also agreed to reserve a
5 percent ownership interest in Emerald for "local investors." In
a sworn statement to the IGB in September 2000, Rosemont Mayor
Stephens testified that the 5 percent "was for [him]." (Id. ¶ 60.)

After the amendment to the Riverboat Gambling Act took effect
in June 1999, more investment activity took place. The amendment,
in addition to permitting Emerald to relocate its casino to
Rosemont, also imposed a requirement that Emerald "attain a level
of at least 20% minority and female ownership." (Complaint ¶ 82
(quoting 230 ILCS 10/11.2 (b)).) To satisfy that requirement, in
late summer 1999, Emerald executed "subscription agreements" for
ownership interests in Emerald with each of the plaintiffs in this
case (who are listed supra n.1), who qualify as statutory "minority
person" and/or "female" investors. The director-officer defendants
raised more than $32 million in capital through their subscription
sales to minority and female investors.

Around the same time, between September 1, 1999 and September
17, 1999, defendant Donald Flynn executed agreements to transfer
almost 5 percent of Emerald's shares to twelve outside investors.
Plaintiffs imply that this 5 percent represented the 5 percent
previously reserved for Mayor Stephens because nine of the twelve

investors (five of whom are defendants in this action) "had ties" to Mayor Stephens.  (Complaint ¶ 61.)  It is alleged that when the IGB sent a letter to Emerald's general counsel on October 19, 1999, asking Emerald to provide, among other things, a comprehensive statement of changes to its capitalization, Emerald responded "evasively" and failed to identify any of the twelve investors who had bought shares from Donald Flynn.  (Id. ¶ 62.)  Among the twelve investors were defendants Vito Salamone, Joseph Salamone, Rocco Suspenzi, Jeffrey Suspenzi, and the Suspenzi Family Corporation.

The sale to the Salamones was initially in the name of Vito Salamone; Emerald later revised its shareholder list to record Joseph Salamone as the investor.  Plaintiffs allege that Vito Salamone "has been identified by the FBI as being close with members and associates of organized crime."  (Id. ¶ 64.)  Pursuant to a memorandum agreement executed in September 1999 and withheld from the IGB and plaintiffs but obtained by the FBI, the shares transferred to the Salamones were in turn divided among the Salamones, Rocco Suspenzi, Jeffrey Suspenzi, and the Suspenzi Family Corporation.

On August 30, 1999, defendant Parkway Bank & Trust Co. ("Parkway"), of which Rocco Suspenzi is the Chairman and Chief Executive Officer, prepared a cashier's check payable to defendant Nick Boscarino in the amount of $1.5 million, purportedly as a loan.  The same day, Nick Boscarino endorsed that check and

deposited it into the account of the newly-created defendant Sherri Boscarino Trust.[3] Also on the same day, a Parkway counter-check payable to Emerald in the amount of $1.5 million was written by defendant Ida L. Hansen, Nick Boscarino's mother, on the Sherri Boscarino Trust account to purchase 1 percent of the outstanding shares of Emerald's capital stock, and Hansen also signed a promissory note payable to Nick Boscarino for $1.5 million (which was not provided to the IGB at any time during its investigation of Emerald's license-renewal application). Plaintiffs allege on information and belief that the Sherri Boscarino Trust was created to conceal Nick Boscarino's and/or Parkway's interest in Emerald, and also allege that the "FBI believes that Nick Boscarino is associated with organized crime in the Chicago area." (Id. ¶ 74.)

In IGB proceedings, the Salamones and the Suspenzis, as well as the Boscarinos and Hansen, refused to testify about their investments in Emerald or about Parkway, invoking the Fifth Amendment. Nick Boscarino refused to answer any questions regarding his personal and business associations with Mayor Stephens.[4] In plaintiffs' view, despite the fact that Emerald's shareholders' agreement prohibits transfers of shares under any

---

[3] Sherri Boscarino, Nick Boscarino's wife and the purported settlor of the Sherri Boscarino Trust, is also named as an individual defendant.

[4] It is alleged that the Suspenzis, Salamones, and Boscarinos "thank[ed]" Mayor Stephens for the investment opportunities in Emerald through political donations made to Mayor Stephens's Committeeman Fund in October 1999. (Complaint ¶¶ 76-79.)

circumstances to any person or entity "if such transfer could reasonably expect to result in the failure of the IGB to renew or a termination of the gaming license," Donald Flynn "failed to conduct any reasonable inquiry into the background of the Salamones or other investors to whom he sold shares. He either intentionally kept himself ignorant . . . or knew their identities and backgrounds and wanted to be able to deny knowledge when necessary." (Id. ¶ 66.)

Plaintiffs allege that they were defrauded because at the time of their investments in Emerald, defendants concealed from them, among other facts, "that secret deals that would not be disclosed to the IGB had been cut to transfer Emerald shares; that an agreement had been made, without disclosure to the IGB, to reserve 5 percent of Emerald's shares for Mayor Stephens or those to whom he wanted to see them distributed; that ownership interests would be transferred to persons with known or suspected associations with organized crime, whom the IGB could not reasonably be expected to approve as owners; that the director and officer defendants had started or intended to start and would start construction of a casino in Rosemont without required disclosures to the IGB of contracts and arrangements for the construction; that millions of dollars, including some or all of the funds that plaintiffs had invested, would be spent or taken out of Emerald by the director and officer defendants before the IGB had renewed Emerald's license

or even indicated that renewal was imminent; and that in the event the IGB denied Emerald a license, their money would not be returned to them." (Id. ¶ 84.) It is also alleged that prior to investing, plaintiff Ernest Ojeda asked defendant Joseph McQuaid what would happen if the IGB denied Emerald's application for a license or if the casino was never built. McQuaid assured Ojeda that Ojeda's money would be returned and that there would be no risk to the investment unless and until Emerald's license was renewed and the casino was built.

Plaintiffs further allege that the director-officer defendants repeatedly ignored and violated statutes and administrative rules and regulations governing transactions by owners of and applicants for Illinois casino licenses. According to plaintiffs, Kevin Flynn repeatedly made misrepresentations to the IGB; Emerald made false statements in its September 1999 renewal application; and Emerald failed to disclose construction-related agreements with Rosemont.

### *Further Proceedings Before the IGB, the Bankruptcy Court, and Illinois State Courts*

On February 22, 2000, as a result of Emerald's "misrepresentations, evasions, and misleading omissions" in its dealings with the IGB, the IGB passed a resolution directing that Emerald provide "a written memorandum explaining a) the reasons the company has failed to comply with the requirements set forth under the Riverboat Gambling Act and Board Rules; and b) the reasons the

company should not be required to immediately cease and desist the construction in Rosemont." (<u>Id.</u> ¶ 92.) Dissatisfied with Emerald's responses, on January 30, 2001, the IGB announced its intent to deny Emerald's application for renewal and to revoke Emerald's license. The announcement was based on three initial findings: (1) Emerald's continued failure to meet the requirements of the Riverboat Gambling Act and the relevant rules; (2) Donald Flynn's unsuitability as a Key Person of Emerald; and (3) Kevin Flynn's unsuitability as a Key Person of Emerald. On March 6, 2001, the IGB issued its written notice of denial and also filed a five-count Complaint for Disciplinary Action against Emerald seeking revocation of the license. On May 21, 2001, Emerald filed a complaint in the Circuit Court of Cook County seeking declaratory relief and a writ of mandamus ordering the IGB to approve Emerald's application for renewal and relocation. (Ultimately, the Illinois Appellate Court ruled in Emerald's favor, see <u>infra</u>).

In July 2001, Emerald entered into an Agreement and Plan of Merger with MGM Mirage ("MGM"), in which MGM agreed to purchase Emerald for more than $615 million. Plaintiffs allege that they would have recouped their investments under the agreement, but the IGB instructed Emerald and MGM not to sign the agreement.

In June 2002, Emerald's creditors filed an involuntary bankruptcy petition against Emerald. In August 2002, the IGB and Emerald entered into a settlement agreement pursuant to which

Emerald would be sold at auction, with proceeds of the sale to be distributed to creditors and equity holders of the company as well as the State of Illinois. Emerald was to withdraw its pending application for renewal of its license and relocation. The settlement agreement gave plaintiffs the option to become a shareholder in Emerald's successor and to hold the same percentage of ownership as they did in Emerald.

Plaintiffs contend that they would have recouped their investment were the settlement agreement to have been effectuated, but on January 21, 2003, the IGB declared the settlement agreement void and resumed prosecution of revocation proceedings against Emerald.

In late 2003, the Illinois Appellate Court held that the amendment to the Riverboat Gambling Act required the IGB to grant Emerald's application for renewal and relocation. Emerald Casino, Inc. v. Illinois Gaming Bd., 803 N.E.2d 914 (Ill. App. Ct. Dec. 30, 2003). Thereafter, on June 29, 2005, the IGB issued Emerald a license that was effective as of the date of Emerald's original application and therefore had already expired. Emerald, of course, objected, and further litigation ensued.[5]

---

[5] In June 2006, the Illinois Appellate Court held that the Riverboat Gambling Act did not permit the IGB's action in 2005 of issuing Emerald a backdated license, and it directed that the IGB issue Emerald a four-year license. The court indicated, however, that nothing in the statute prevented the IGB from moving to revoke the license once granted. Id. at 848. Emerald Casino, Inc. v. Illinois Gaming Bd., 851 N.E.2d 843 (Ill. App. Ct. June 13, 2006).

On November 15, 2005, the administrative law judge appointed to preside over the revocation proceedings issued written findings of fact and recommended that the IGB revoke Emerald's license and block any efforts by Emerald to engage in the gambling business anywhere in Illinois. The IGB issued a final administrative order on December 20, 2005, in which it concurred with and adopted the ALJ's recommendation and revoked Emerald's license.

### *The Instant Action*

Plaintiffs then filed the instant action on January 25, 2006 and have amended the complaint three times. The third amended complaint contains nine counts. Counts I and II are for violation of RICO (Count I, against the director-officer defendants) and conspiracy to violate RICO (Count II, against all defendants), 18 U.S.C. § 1962(c) & (d). It is alleged that Emerald is an "enterprise" as defined by the RICO statute; that the director-officer defendants conducted Emerald's affairs through a continuous pattern of activity that included public corruption and mail fraud; and that all defendants, together with other co-conspirators who are not parties to this action, agreed to conduct and participate in or to facilitate the operation of Emerald's affairs as part of a scheme to defraud both plaintiffs and the IGB.

Plaintiffs also allege the following state-law claims: common-law fraud (Count III); constructive fraud (Count IV); breach of fiduciary duties (Count V); violation of the Illinois Consumer

Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. (Count VI); equitable estoppel (Count VII); constructive trust (Count VIII); and common-law civil conspiracy (Count IX). Of the state-law claims, Counts VI and VIII are asserted against the director-officer defendants, and Counts III, IV, V, VII, and IX are asserted against all defendants. Plaintiffs seek compensatory damages of over $28 million, treble damages pursuant to RICO, punitive damages, attorney's fees, costs and expenses, and a "full accounting of how plaintiffs' funds were spent." (Third Amended Complaint, Prayer for Relief.)

Five separate motions to dismiss the third amended complaint have been filed by (1) the director-officer defendants; (2) Parkway, Rocco Suspenzi, and the Suspenzi Family Corporation; (3) Jeffrey Suspenzi; (4) Nick Boscarino, Sherri Boscarino, the Sherri Boscarino Trust, and Ida Hansen; and (5) Joseph Salamone and Vito Salamone. In addition, the Boscarino defendants move to strike paragraph 74 of the third amended complaint.

## **DISCUSSION**

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits. 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356, at 354 (3d ed. 2004). When evaluating such a motion, the court must accept as true all factual allegations in the complaint and draw all reasonable inferences in

the plaintiff's favor.  <u>Hentosh v. Herman M. Finch Univ. of Health Sciences</u>, 167 F.3d 1170, 1173 (7th Cir. 1999); <u>Jang v. A.M. Miller & Assocs.</u>, 122 F.3d 480, 483 (7th Cir. 1997).  Dismissal is appropriate only if "'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'"  <u>Ledford v. Sullivan</u>, 105 F.3d 354, 356 (7th Cir. 1997) (quoting <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984)).

## A.     Plaintiffs' RICO Claims (Counts I and II)

Defendants' first argument is that plaintiffs' RICO claims pursuant to 18 U.S.C. § 1962 are barred by the following provision of the Private Securities Litigation Reform Act, which amended the RICO statute as follows:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, <u>except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962</u>.

18 U.S.C. § 1964(c) (emphasis added) (the "PSLRA bar").  The PSLRA bar "was intended by Congress to eliminate securities fraud as a predicate offense in a civil RICO action and to bar a plaintiff from pleading other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud."  <u>In re Enron Corp. Sec., Derivative, & ERISA Litig.</u>, 284 F. Supp. 2d

511, 618 (S.D. Tex. 2003) (internal quotation marks and brackets omitted). "The RICO Amendment bars claims based on conduct that could be actionable under the securities laws even when the plaintiff, himself, cannot bring a cause of action under the securities laws. The language of the statute does not require that the same plaintiff who sues under RICO must be the one who can sue under securities laws . . . ." Id. at 620; see also Howard v. America Online Inc., 208 F.3d 741, 749-50 (9th Cir. 2000); Hollinger Int'l, Inc. v. Hollinger Inc., No. 04 C 698, 2004 WL 2278545, at *7 (N.D. Ill. Oct. 8, 2004); Baron v. Chehab, No. 05-3240, 2006 WL 156828, at *9 n.2 (C.D. Ill. Jan. 20, 2006); Hemispherx Biopharma, Inc. v. Asensio, No. CIV. A. 98-5204, 1999 WL 144109, at *4 (E.D. Pa. Mar. 15, 1999).

Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder make it unlawful for a person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b); see also 17 C.F.R. § 240.10b-5. The elements of a § 10(b) or Rule 10b-5 securities fraud claim are that the defendant (1) made a misstatement or omission; (2) of material fact; (3) with scienter; (4) in connection with the purchase or sale of securities; (5) upon which the plaintiff relied; and (6) that reliance proximately caused plaintiff's

injuries. <u>See</u> <u>In re Healthcare Compare Corp. Sec. Litig.</u>, 75 F.3d 276, 280 (7th Cir. 1996). Defendants contend that because plaintiffs allege that they entered into agreements to purchase shares of Emerald stock and that they were defrauded at the time of their investments by defendants' misrepresentations and concealment, their claims are based on conduct that would be actionable as securities fraud, and thus the RICO claims are barred.

Plaintiffs present two arguments in response: (1) the transactions at issue did not involve a "security"; and (2) even if the PSLRA bar does require dismissal of certain of plaintiffs' claims, it requires dismissal of at most only the claims against defendant Joseph McQuaid and "perhaps" those against defendant Kevin Flynn.

The Securities Exchange Act of 1933, 15 U.S.C. § 77b(a)(1), and the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), define a "security" broadly as "any note, stock, treasury stock, security future, bond, debenture, . . . investment contract, . . . or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the

foregoing."[6] Defendants maintain that the subscription agreements that plaintiffs entered into, an example of which is attached as Exhibit C to the Declaration of Kevin M. Forde in support of the director-officer defendants' motion,[7] constitute both "the right to subscribe to or purchase" stock as well as "investment contracts."

We need not consider whether the Emerald subscription agreement amounted to the right to purchase "stock"[8] because the agreement meets the definition of an "investment contract." In <u>SEC v. W.J. Howey Co.</u>, 328 U.S. 293, 301 (1946), the Supreme Court defined "investment contract" as a transaction that "involves an investment of money in a common enterprise with profits to come solely from the efforts of others." <u>See also</u> <u>SEC v. Lauer</u>, 52 F.3d 667, 670 (7th Cir. 1995) (the phrase "investment contract" is a "term of art in the securities laws. It means an interest that is not a conventional security like a bond or a share of common stock but that, having the essential properties of a conventional

---

[6] We are quoting from the 1933 Act, but the 1934 Act's definition differs only very slightly, and the two definitions are generally treated as identical in meaning, see <u>Landreth Timber Co. v. Landreth</u>, 471 U.S. 681, 686 n.1 (1985).

[7] Documents that a defendant attaches to a motion to dismiss, if they are referred to in the plaintiff's complaint and are central to his claims, can be considered without converting the motion into a motion for summary judgment. <u>See</u> <u>Venture Assocs. Corp. v. Zenith Data Sys. Corp.</u>, 987 F.2d 429, 431 (7th Cir. 1993).

[8] The fact that an instrument is labeled "stock" does not mean that it qualifies as "stock" for purposes of the securities laws. It must also bear the usual characteristics of stock, such as negotiability and the right to receive dividends. <u>See</u> <u>Landreth</u>, 471 U.S. at 686. Even though the subscription agreement refers to shares of "common stock" of Emerald, it appears doubtful that the agreement constituted the right to purchase "stock" because the subscription agreement does not indicate that the Emerald shares have the requisite characteristics of "stock" as set forth in <u>Landreth</u>.

security—being an undivided, passive (that is, not managed by the investor) financial interest in a pool of assets—is treated as one for purposes of these laws.").

The "investment of money" prong requires that the investor commit his assets to the enterprise in such a way as to subject himself to financial loss. See SEC v. Rubera, 350 F.3d 1084, 1090 (9th Cir. 2003). Pursuant to the Emerald subscription agreement, plaintiffs agreed to purchase Emerald shares and that the cash they tendered would "be available to [Emerald] for its unrestricted use and general corporate purposes." (Declaration of Kevin M. Forde, Ex. C, Subscription Agreement, at 1.) Moreover, plaintiffs expressly acknowledged that "the Shares are speculative investments that involve a high degree of risk of loss of the entire investment of [plaintiffs] in [Emerald]" and that "the recently enacted legislation which authorized [Emerald] to relocate its gambling operations is subject to potential legal action or future legislative changes that could result in the loss of the entire investment of [plaintiff] in [Emerald]." (Id. at 4.) It appears, therefore, that plaintiffs did commit their assets to Emerald in such a manner as to subject themselves to financial loss.

Plaintiffs maintain that their "mere payment of money" did not involve any prospect of loss because of the following provision of the subscription agreement: "In the event that the IGB determines that [plaintiff] is not an acceptable owner of [Emerald], (a) this

agreement shall immediately terminate without any further action
required of the parties, (b) [Emerald] shall not issue the Shares,
and (c) [Emerald] shall have no liability or obligations to
[plaintiff], except [Emerald] shall return the Purchase Price
without interest to [plaintiff] within ninety days after such
determination by the IGB." (Id. at 1.)  This provision, however,
is simply a contingency attached to plaintiffs' right to acquire
shares of Emerald; it does not change the fact that plaintiffs were
putting their money at risk.  See Yoder v. Orthomolecular Nutrition
Inst., Inc., 751 F.2d 555, 559 & 559 n.4 (2d Cir. 1985)
(determining that a transaction constituted a "sale of stock" and
finding it immaterial that the seller's obligation to deliver the
stock had a contingency attached) ("We perceive no reason why a
contingency attached to a contractual right to acquire stock should
remove that right from securities law coverage simply because it
increases the risk that plaintiff will not obtain the shares.").

Plaintiffs also assert that they did not invest their money in
a "common enterprise with profits to come solely from the efforts
of others" because they did not actually receive stock or voting
rights, and the IGB never determined that they were acceptable
owners of Emerald.  This is an odd argument because the issue is
not whether the contract was fully performed, but rather, the
nature of the contemplated investment.  The representations made by
the promoters, not their actual conduct, determine whether an

interest is an investment contract or other security.  <u>Lauer</u>, 52
F.3d at 670.

Here, the subscription agreement contemplated that plaintiffs
were joining in with other investors in Emerald, pooling their
interests with the expectation of receiving a return on their
investment from the efforts of persons other than themselves--
Emerald's management.  This scenario meets the definition of a
"common enterprise with profits to come solely from the efforts of
others" as discussed in <u>SEC v. Edwards</u>, 540 U.S. 389 (2004).  In
addition, we are unpersuaded by plaintiffs' conclusory, and
untenable, argument that the subscription agreements were not
"securities" because investments in casino operations are subject
to an extensive regulatory scheme.  We hold that the subscription
agreement--the transaction on which plaintiffs' claims are based--
constitutes an "investment contract" and thus a "security" subject
to federal securities laws.

Plaintiffs' second argument against application of the PSLRA
bar is that the securities laws impose liability only on those who
make a false or misleading statement and not on those who aid or
abet such statements.  In plaintiffs' view, because the complaint
pleads only that Joseph McQuaid and "perhaps" Kevin Flynn made
fraudulent misrepresentations, the PSLRA does not bar the claims
against the remaining defendants.  Plaintiffs are incorrect.
Aiding and abetting a violation of the federal securities laws is

actionable. <u>See</u> <u>Baron</u>, 2006 WL 156828, at *9 (citing 15 U.S.C. § 78t(e)). The fact that it is actionable by the SEC alone, and not by plaintiffs, does not affect the analysis; as stated <u>supra</u>, the PSLRA bar is based on whether the conduct is actionable as securities fraud, not whether it is actionable by a particular plaintiff. <u>Id.</u> at *9 n.2 and cases cited <u>supra</u>.

Because plaintiffs' RICO claims rely on conduct that would be actionable as securities fraud, those claims are barred by 18 U.S.C. § 1964(c) and will be dismissed. In view of this ruling, we need not reach defendants' other arguments for dismissal.

**B.     Plaintiffs' State-Law Claims (Counts III-IX)**

Pursuant to 28 U.S.C. § 1367(c)(3), we are permitted to decline to exercise supplemental jurisdiction over a state-law claim if we have dismissed all claims over which we have original jurisdiction. In this circuit, "the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." <u>Kennedy v. Schoenberg, Fisher & Newman, Ltd.</u>, 140 F.3d 716, 727 (7th Cir. 1998). Having resolved the federal questions in this action, we decline to exercise supplemental jurisdiction over the state-law claims asserted by plaintiffs.

**CONCLUSION**

For the foregoing reasons, defendants' motions to dismiss the third amended complaint are granted. Because it does not appear that plaintiffs would be able to successfully amend the complaint to state a federal claim, Counts I and II, the RICO claims, are dismissed with prejudice. We decline to exercise supplemental jurisdiction over Counts III-IX, and those claims are dismissed without prejudice to refiling them in state court. In view of this dismissal, the Boscarino defendants' motion to strike paragraph 74 of the third amended complaint is denied as moot. The case is terminated.

DATE:          October 26, 2006


ENTER:         _____

John F. Grady, United States District Judge